IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ESTES JENNINGS,

     Petitioner,

v.                                  Civil Action No.  3:18CV553–HEH

BERNARD BOOKER,

     Respondent.

## REPORT AND RECOMMENDATION

Estes Jennings,[1] a Virginia inmate proceeding *pro se,* filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his convictions for carjacking, wearing a mask in public, assault and battery, and grand larceny in the Spotsylvania County Circuit Court ("Circuit Court"). This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). Respondent has moved to dismiss. (ECF No. 12.) For the reasons set forth below, it is RECOMMENDED that the Motion to Dismiss be GRANTED.

### A.    Jennings's Claims

Jennings contends that he is entitled to relief upon the following grounds:

Claim 1    "The trial court abused its discretion in denying [Jennings's] motion for expert funds." (§ 2254 Pet. 5.)[2]

---

[1] The Clerk is directed to amend the caption on the docket to reflect the appropriate first and last name of Petitioner, which is set forth above in the caption.

[2] The Court employs the pagination assigned by the CM/ECF docketing system for the citations to the parties' submissions.  The Court corrects the capitalization, punctuation, spelling, and emphasis in quotations from the parties' submissions.

Claim 2      "The trial court erred in denying [Jennings's] motion to suppress the eyewitnesses' out-of-court and in-court identifications of [Jennings]." (*Id.* at 7.)

Claim 3      "The trial court abused its discretion in refusing to give any jury instruction regarding eyewitness testimony." (*Id.* at 12.)

Claim 4      "The trial court abused its discretion in failing to hold an evidentiary hearing to ascertain whether jury misconduct occurred and whether such jury misconduct prejudiced the case." (*Id.* at 16.)

Claim 5      "Petitioner was denied due process because of jury misconduct that occurred during jury deliberations." (*Id.* at 19.)

Claim 6      "Petitioner is actually innocent of the crime." (*Id.* at 22.)

Claim 7      "Petitioner was denied his right to a fair trial when the jury was falling asleep during deliberations." (*Id.* at 24.)

Claim 8      "Petitioner was denied his constitutional right to effective assistance of counsel when his attorney, Jenna Nacht, failed to correctly draft Jury Instruction X." (*Id.* at 27.)[3]

Claim 9      "Petitioner was denied his right to effective assistance of counsel when his attorney, Ms. Nacht/Ms. Abernathy, failed to correctly request the assistance of an expert witness." (*Id.* at 29.)

Claim 10     "Petitioner was denied his right to effective assistance of counsel when his attorneys . . . failed to object to the prosecutor expressing her personal opinion in closing argument." (*Id.* at 33.)

Claim 11     "Petitioner was denied his right to effective assistance of counsel when his attorneys . . . failed to object to the prosecutor vouching for the credibility of the witnesses in closing argument." (*Id.* at 36.)

Claim 12     "Petitioner was denied his right to the effective assistance of counsel when his attorney, Ms. Abernathy, told the jury [the] police know who committed the crime." (*Id.* at 38.)

---

[3] Jennings was represented by two attorneys at trial, Jenna Nacht and Sarah Abernathy. (Nov. 14, 2014 Tr. 2.)

Claim 13    "Petitioner was denied his right to due process when the jurors failed to follow the Court's instructions." (*Id.* at 41.)

Claim 14    "Petitioner was denied his right to a fair trial when information from the courtroom was leaked into the jury room prior to the beginning of trial." (*Id.* at 44.)

Claim 15    "Petitioner was denied his right to effective assistance of counsel when his attorney, Jenna C. Nacht, conceded Petitioner's guilt in the direct appeal brief." (*Id.* at 47.)

Respondent moves to dismiss on the grounds that Claims 7 and 14 are defaulted and Jennings's remaining claims lack merit. Petitioner has responded. For the reasons set forth below, it is RECOMMENDED that the Motion to Dismiss (ECF No. 12) be GRANTED.

## B.    Exhaustion and Procedural Default

Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). State exhaustion "is rooted in considerations of federal-state comity," and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n. 10 (1973)). The purpose of exhaustion is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). Exhaustion has two aspects. First, a petitioner must utilize all available state remedies before he can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas

3

petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate opportunity to address the constitutional claims advanced on federal habeas. "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). Fair presentation demands that "both the operative facts and the controlling legal principles" must be presented to the state court. *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal habeas petitioner also procedurally defaults claims when the

"petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (quoting *Coleman*, 501 U.S. at 735 n. 1).[4] The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citing cases). Absent a showing of "cause for the default and actual prejudice as a result of the alleged violation of federal law," or a showing that "failure to consider the claims will result in a fundamental miscarriage of justice," this Court cannot review the merits of a defaulted claim. *Coleman*, 501 U.S. at 750; *see Harris v. Reed*, 489 U.S. 255, 262 (1989).

When Jennings presented Claims 7 and 14 to the Supreme Court of Virginia on state habeas, that court found that Claims 7 and 14 were barred under *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), because Jennings could have raised, but failed to raise, these claims at trial and/or on direct appeal. (ECF No. 14–13, at 2, 8 (citing *Slayton*, 205 S.E.2d 682).) *Slayton* constitutes an adequate and independent state procedural rule when so applied. *See Mu'Min v. Pruett*, 125 F.3d 192, 196–97 (4th Cir. 1997). Thus, Jennings has procedurally defaulted Claims 7 and 14 unless he demonstrates cause and prejudice to excuse his default or his actual innocence. For the reasons set forth below, the Court rejects Jennings's suggestion that he is actually innocent or that ineffective assistance of appellate counsel excuses his default.

---

[4] Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

### C.   Applicable Constraints upon Federal Habeas Corpus Review

To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).   The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus.   Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)).   Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).   Given the foregoing restrictions, the findings of the Virginia courts figure prominently in this Court's opinion.

### D.   Summary of the Evidence

Stacey Berry testified that, on August 2, 2013, he was working as the 11:00 p.m. to 7:00 a.m. shift clerk at a 7-Eleven in Spotsylvania County.  (Nov. 14, 2014 Tr. 181–82.)

6

Berry saw Jennings wander in and out of the store that evening and, on one occasion, Jennings asked Berry for a cigarette. (Nov. 14, 2014 Tr. 183–85.) Shorty after Berry last saw Jennings, Berry heard screaming coming from outside of the store.  (Nov. 14, 2014 Tr. 184–86.) Berry called 911 and then ran out of the store to find Jennings trying to steal a woman's car. (Nov. 14, 2014 Tr. 186–87, 190.) Berry and another concerned citizen, Kevin Brown, reached through the driver's side window and attempted to stop Jennings from taking off with the car. (Nov. 14, 2014 Tr. 187–89.) Nevertheless, Jennings was able to back up and take off with the car. (Nov. 14, 2014 Tr. 188–89.) The car, however, broke down just after leaving the parking lot and came to a stop on the side of the road.  (Nov. 14, 2014 Tr. 189–90.)  When the police arrived, Berry showed the police the surveillance video from the store, which depicted Jennings talking to Berry shortly before the carjacking. (Nov. 14, 2014 Tr. 190–91, 193–97.)

Kaitlin Smith testified that on August 2, 2013, at or about 3:30 a.m., she stopped at a 7-Eleven store in Spotsylvania. (Nov. 14, 2014 Tr. 247–48.) After she left the store and got back into her car, a man in a skeleton mask jumped into her passenger seat. (Nov. 14, 2014 Tr. 249–50.) The man held a knife to Smith's stomach and told her "to put the car in reverse and drive." (Nov. 14, 2014 Tr. 251.) Smith put the car in reverse, began to scream, and attempted to jump out of the car. (Nov. 14, 2014 Tr. 252–53.) Brown ran over, and with Berry's assistance, attempted to remove the keys from the car. (Nov. 14, 2014 Tr. 253–55.) After Smith put the car in reverse, the thief removed his mask. (Nov. 14, 2014 Tr. 256, 259.) Brown and Berry, however, were not able to get possession of the keys to the car. (Nov. 14, 2014 Tr. 254.)

7

When Smith later went to her car on the side of the road, she discovered that the thief had taken her phone and about $200 from her wallet. (Nov. 14, 2014 Tr. 257.) Smith also discovered that the thief had cut her shoulder with the knife. (Nov. 14, Tr. 258.) Smith admitted that she did not get a good look at the face of the man who took her car and could not identify Jennings as the robber. (Nov. 14, 2014 Tr. 259–60.)

Kevin Brown testified that he was sitting in his vehicle at the 7-Eleven in the early morning of August 2, 2013. (Nov. 14, 2014 Tr. 277–78.) Jennings knocked on the window of Brown's car and asked Brown for a cigarette. (Nov. 14, 2014 Tr. 279–80.) When Brown told Jennings no, Jennings went into the store. (Nov. 14, 2014 Tr. 281.) Thereafter, Smith pulled into the parking lot in her car and went into the store. (Nov. 14, 2014 Tr. 282.) Jennings then exited the store, walked past Smith's car and went around the corner of the building. (Nov. 14, 2014 Tr. 284.) Next, Smith exited the store and got into her car. (Nov. 14, 2014 Tr. 284–85.) Brown then observed Jennings "pop[]" back into view in Smith's passenger seat, but now wearing a mask. (Nov. 14, 2014 Tr. 285.) Brown then heard Smith scream and ran to her aid. (Nov. 14, 2014 Tr. 286–89.) Eventually, Brown and Berry were able to get Smith out of her vehicle, and Jennings then drove the vehicle out of the parking lot. (Nov. 14, 2014 Tr. 291.) The vehicle then stopped about a block and a half up the street. (Nov. 14, 2014 Tr. 291–92.) Jennings stumbled out of the car and ran down the street. (Nov. 14, 2014 Tr. 292–93.)

### E.     Analysis

#### 1.     Denial of Request for Funds for Expert Regarding the Unreliability of Eyewitness Identification

##### a.     Claim 1

In Claim 1, Jennings contends that "[t]he trial court abused its discretion in denying [his] motion for expert funds." (§ 2254 Pet. 5.)  Respondent correctly notes that in his § 2254 Petition, Jennings failed to raise any basis for federal habeas relief in Claim 1 because he merely raised the issue as a violation of state law.[5]  Nevertheless, in his Reply, for the first time Jennings suggests that the failure to appoint an expert denied him due process. (ECF No. 16, at 10 (citing *Ake v. Oklahoma*, 470 U.S. 68 (1985).)

"Supreme Court precedent establishes the principle that the government, upon request, must provide indigent defendants with the 'basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners.'" *Weeks v. Angelone*, 176 F.3d 249, 264 (4th Cir. 1999) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)), *aff'd*, 528 U.S. 225 (2000).  In *Ake*,

> the Supreme Court held that as part of the basic tools of an adequate defense, an indigent defendant has a due process right to the appointment of a psychiatrist to assist him in his defense when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial."

*Id.* (quoting *Ake*, 470 U.S. at 83).

---

[5] In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

In *Husske v. Commonwealth*, 476 S.E.2d 920 (Va. 1996), the Supreme Court of Virginia announced the "particularized need" test for assessing when due process requires the appointment of expert assistance. *Morva v. Zook*, 821 F.3d 517, 525 (4th Cir. 2016) (discussing *Husske*), *cert. denied*, 137 S. Ct. 1068 (2017). Under the particularized need standard: "an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance." *Id.* (quoting *Husske*, 476 S.E.2d at 925). "To satisfy this burden, the defendant must demonstrate that the 'expert would materially assist him in the preparation of his defense' and that the expert's absence 'would result in a fundamentally unfair trial.'" *Id.* (quoting *Husske*, 476 S.E.2d at 925).[6]

When Jennings raised the issue of denial of expert assistance on direct appeal, the Court of Appeals of Virginia concluded that Jennings failed to satisfy the *Husske* standard and observed:

> "[T]he refusal to admit expert testimony on the subject of eyewitness testimony is a matter within the [sound] discretion of the trial court." *Rodriguez v. Commonwealth*, 20 Va. App. 122, 127, 455 S.E.2d 724, 727 (1995) (recognizing that in some "narrow" circumstances, including the "psychological phenomena" of unconscious transference, an expert in eyewitness identification may be useful to the jury). A trial court does not abuse its discretion by denying expert funds when an appellant has failed to show that the expert's fee would have been "'reasonable'" and his assistance would have been "'appropriate under the circumstances of the case.'" *Singleton v. Commonwealth*, 16 Va. App. 841, 841, 433 S.E.2d 507, 507 (1993) (quoting Code § 19.2–163(2)).

---

[6] The United States Court of Appeals for the Fourth Circuit has concluded that the "*Husske* standard is congruent with the requirements of the federal Constitution." *Morva*, 821 F.3d at 525 (quotation marks omitted) (citation omitted).

At a hearing before the trial court, appellant's counsel stated she planned to assert the defense of mistaken identity at the trial. Appellant's counsel averred that her own "basic research" had led her to the belief that the theories of "unconscious transference" or "bystander confusion" applied in the case. She requested funds to obtain an expert witness to "explor[e]" the theory, stating "this phenomenon can occur." She also asked for an expert to assist in the preparation of cross-examination and jury instructions on the unreliability of eyewitness identification.

However, appellant's counsel could not proffer the identity of an expert witness, stating she had "some potential leads," but that she had been unable to find an expert at the time of the hearing. Thus, she could not proffer the qualifications of the expert or anything more than an approximation of the possible costs of an expert. Appellant's counsel requested $500 to try to secure an initial consultation, but admitted she would not know how much more in expert funds the defense would require until after that consultation. Appellant conceded that Virginia courts generally "don't allow funds for expert witnesses on identification or allow them to testify." Appellant did not identify any Virginia cases where the sort of expert testimony he sought funds for was found admissible, and acknowledged our holding in *Currie v. Commonwealth*, 30 Va. App. 58, 64, 515 S.E.2d 335, 338 (1999) (quoting *Rodriguez v. Commonwealth*, 20 Va. App. 122, 127, 455 S.E.2d 724, 727 (1995)), where we noted that

> "In excluding expert commentary on eyewitness identifications, courts have consistently found that this type of testimony interferes with the jury's role as fact finder and its duty to weigh the credibility of witnesses.... [T]his type of testimony frequently has the potential of turning trials into battles between experts over the value of eyewitness identifications."

The trial court found appellant failed to show "any need for or proper use of an expert in this case," stating, "Eyewitness identification and the problems with it are what lawyers argue all the time and the triers of fact decide."

On this record, we cannot say the trial court abused its discretion in finding appellant failed to show a particularized need for the expert witness and in denying the request for expert witness funds. Even without the services of an expert witness, appellant had the opportunity to challenge the eyewitness identification evidence through cross-examination and arguments. A "jury [i]s capable of evaluating whether the victim's identifications of appellant were reliable or whether the identifications were incorrect based on [any] suggested problems associated with memory." *Currie*, 30 Va. App. at 66, 515 S.E.2d at 339 (holding the trial court did not

11

abuse its discretion in excluding expert testimony on "the theory of transference"). Additionally, even if we were to accept appellant's contention that the trial court should have found expert testimony appropriate in this case, appellant failed to show that the amount requested was reasonable where appellant did not have more than a "ball-park[]" estimate for the cost of an as-yet undetermined expert. Counsel's proffer as to the cost of securing an expert did not furnish the trial court with enough information from which to make a reasonableness determination as required by Code § 19.2–163(2). *See Singleton*, 16 Va. App. at 841, 433 S.E.2d at 507.

(ECF No. 14–6, at 3–4 (alterations in original).)

For the reasons stated by the Court of Appeals of Virginia, this Court agrees that Jennings failed to demonstrate a due process right to expert assistance on the issue of eyewitness identification. Accordingly, it is RECOMMENDED that Claim 1 be DISMISSED.

### b.   Claim 9

Relatedly, in Claim 9, Jennings contends that the failure to obtain expert assistance was attributable to the ineffective assistance of counsel. (§ 2254 Pet. 29.) Jennings asserts that counsel failed to explain adequately why such an expert was necessary and failed to provide a name of the expert and an accurate estimate for the cost of the expert's work. (*Id.* at 30.) In rejecting this claim, the Supreme Court of Virginia concluded that this claim

satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the transcript of the September 11, 2014 hearing and the manuscript record, demonstrates counsel filed a pre-trial motion to obtain funds from the trial court to hire an expert in the field of eyewitness identification. At a hearing on the motion, counsel contended such an expert was necessary to explain the theory of "unconscious transference" or "bystander confusion." Based on this theory, counsel asserted the witnesses who identified petitioner as the perpetrator were mistaken. At the time of the hearing, counsel sought $500 to cover an initial consultation. Counsel represented she had conducted initial research

12

to find an expert, but had not yet located an expert in the field who was willing to testify or determined the final costs for retaining such an expert. Counsel, however, informed the trial court a psychology professor with whom she spoke estimated it would cost approximately $2,500. Counsel also stated, based on her research, she expected such an expert to charge an hourly rate between $150 and $350. The Commonwealth opposed counsel's request for expert funds.

      The trial court denied the request because it determined there was sufficient literature on the subject, which counsel could rely on in preparing petitioner's defense, and neither "the Legislature or the Appellate Courts" had required the use of experts to prove the reliability of eyewitness identifications. The trial court did not deny the request because counsel had not adequately prepared the motion or failed to include sufficient information about a potential expert. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

(ECF No. 14–13, at 4–5.) Because the Supreme Court of Virginia's rejection of this claim was eminently reasonable, *see* 28 U.S.C. § 2254(d)(1) & (2), it is RECOMMENDED that Claim 9 be dismissed.

### 2.    Claims Pertaining to Eyewitness Identification

#### a.    Claim 2

In Claim 2, Jennings contends that the Circuit Court erred in failing to suppress the eyewitnesses' out-of-court and in-court identifications of him. Initially, Respondent notes that, in his § 2254 Petition, Jennings failed to raise any basis for federal habeas relief because he merely raised the issue as a violation of state law. Nevertheless, in his Reply, for first time Jennings suggests that the eyewitness identification was unduly suggestive and violated due process. (ECF No. 16, at 11 (citing *Neil v. Biggers*, 409 U.S. 188 (1972).)

The Supreme Court has outlined a two-step approach to determine the admissibility of identification testimony. First, the defendant must prove that the identification

procedure was impermissibly suggestive.  *Holdren v. Legursky*, 16 F.3d 57, 61 (4th Cir. 1994) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).  "Second, even if the procedure was suggestive, the in-court identification is valid provided the identification is reliable." *United States v. Johnson*, 114 F.3d 435, 441 (4th Cir. 1997) (citing *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996)).

As noted by the Court of Appeals of Virginia, Jennings fails to demonstrate that the initial photographic identification procedure was unduly suggestive.  In rejecting this claim, the Court of Appeals of Virginia made the following observations and findings:

> Appellant argues the photographic lineup shown to the eyewitnesses was unduly suggestive, thus, the trial court erred by failing to suppress the witnesses' identifications of appellant.
>
> "'A defendant seeking to suppress an out-of-court identification resulting from a photographic lineup bears a weighty burden of establishing both (1) that the procedure was impermissibly suggestive and (2) that this flaw created a substantial likelihood of irreparable misidentification.'" *Taylor v. Commonwealth*, 52 Va. App. 388, 392, 663 S.E.2d 536, 538 (2008) (quoting *Hodges v. Commonwealth*, 45 Va. App. 735, 773–74, 613 S.E.2d 834, 852 (2005), *rev'd on other grounds*, 272 Va. 418, 634 S.E.2d 680 (2006)).
>
> > "In determining whether a photographic lineup was impermissibly suggestive under part (1) of the above test, a court should look to both the photographs themselves and the manner in which they were presented to the identifying witness.  A valid lineup does not require that all the suspects or participants be alike in appearance and have the same description as long as nothing singles the accused out from the rest.  Where police indicate to the witness prior to the witness' viewing the photographs that they have evidence that one of the people in the lineup committed the crime, the chance of misidentification is heightened."
>
> *Id.* (quoting *Hodges*, 45 Va. App. at 774–75, 613 S.E.2d at 853).

Detective Short testified he prepared the two photograph lineups used in the case and he placed booking photographs of appellant in both of the lineups. Short stated that when compiling the first lineup, he looked at a still photo taken from a surveillance video of the suspect recorded on the night of the incident. He then chose appellant's booking photo that most resembled the surveillance photo, and then retrieved computer-generated lineups including the selected booking photo.

Captain Pearce, who was not working on appellant's investigation, showed the lineups to the witnesses, but Short was also present during that process. Pearce presented the photographs sequentially to the witnesses to see if they could identify anyone in the lineup. Pearce read instructions to the witnesses before starting the process and he asked the witnesses to initial each instruction.

Short testified that the victim was unable to identify a suspect from the photograph arrays, stating it happened "so quick" and the suspect was wearing a mask. Stacey Berry identified appellant after viewing the first lineup. Short stated that Berry said he was "one hundred percent" sure of his identification. Berry testified at the motion to suppress hearing that once he saw appellant's photograph "that was it." Kevin Brown chose appellant's photograph from the first lineup, but he also stated he was not sure of the identification because he had "seen more of [the suspect's] eyes during the incident." Short prepared the second lineup with a different photograph of appellant and photographs of other different individuals for the second lineup. Brown chose appellant's photograph from the second lineup.

Short testified that the "filler" photographs in the lineup were first generated by a computer, then he chose the photographs that most closely matched the person in the surveillance video. Short testified to how he operated the computer-generated lineup software, explaining that it allows the police to choose photos "that wouldn't be a bias to [appellant's] picture." Short testified he did not gesture to any of the witnesses while they viewed the lineup and he did not see Pearce nod to the witnesses or point to a particular photograph.

The trial court reviewed the photographs in the lineups and stated, "These are two of the best lineup pictures I've ever seen.... [T]he backgrounds are similar, the posing is similar, and I think people look similar." The court also found that, although appellant was "looking down" in his photograph in the first lineup, several other individuals were also "looking down" in their photos. The trial court further found the photograph of appellant used in the second lineup was not "that similar" to the photograph of appellant used in the first lineup. Thus, the trial court concluded, "[T]he lineup pictures themselves were appropriately chosen and are not unduly suggestive. The procedure was not unduly suggestive." The trial court accepted the testimony of Pearce and Short as to how the lineups

were presented to the identifying witnesses, stating, "[T]here was nothing in any way that it was presented that would lead one to think that there was any possibility of any undue suggestion on behalf of either of these folks in the presentation of the lineup[s]."

The evidence supported the trial court's findings, so we are bound by those findings. Each witness viewed the photographs separately. The photograph backgrounds, posing, and individuals depicted appeared comparable. Neither Pearce nor Short suggested that the witnesses should choose appellant's photograph. Given these facts, the lineups at issue were not unduly suggestive. Accordingly, the trial court did not err by denying the motion to suppress the identification evidence.

(ECF No. 14–6, at 5–7 (alterations in original).) Review of the record does not reflect that the Court of Appeals' decision was unreasonable.[7] *See* 28 U.S.C. § 2254(d)(1) & (2). Moreover, both Brown's and Berry's in-court identification of Jennings was eminently reliable given the time which they had to observe Jennings both before and after he committed the crimes. Accordingly, it is RECOMMENDED that Claim 2 be DISMISSED.

### b. Claims 3 and 8

In Claim 3, Jennings complains that the Circuit Court "abused its discretion in refusing to give any jury instruction regarding eyewitness testimony." (§ 2254 Pet. 12.) Relatedly, in Claim 8, Jennings contends his attorney deprived him of effective assistance of counsel by failing to draft an instruction regarding eyewitness testimony that the Circuit Court would have found acceptable. (*Id.* at 27.) Initially, the Court notes that Jennings fails to articulate any error of constitutional magnitude with respect to Claim 3 that would entitle him to federal habeas relief. *See Estelle*, 502 U.S. at 67–68. In rejecting Claim 8, the Supreme Court of Virginia found that it

---

[7] The photocopies of the photographic lineups transferred to this Court are not particularly clear.

satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The record, including the trial transcript, demonstrates two eyewitnesses identified petitioner as the perpetrator. Petitioner's trial counsel argued their identifications were mistaken. At the conclusion of the trial, counsel proffered a cautionary instruction regarding the jury's evaluation of eyewitness testimony. In the event the trial court determined a cautionary instruction on eyewitness testimony was necessary, the Commonwealth proffered an alternative instruction, which was more limited. The trial court refused counsel's proffered instruction, finding it came "too close to a comment on the evidence, calling attention to particular types of things that are argument." Counsel then requested the court give the Commonwealth's alternative instruction to the jury, which the trial court refused, explaining, "I think if we are going to give any instruction it ought to be complete, like you said. And I'm not going to give one that has everything in it. So I am not going to give one that only has some things in it." Counsel then inquired into the possibility the court may approve an instruction between the two extremes proffered by the parties, to which the court said, "I don't think giving an instruction that calls attention to a particular aspect of the case is appropriate." The trial court then instructed the jurors that petitioner was presumed innocent, the Commonwealth had the burden to prove petitioner committed the crimes, and about their function in determining the credibility of witnesses. Further, counsel thoroughly cross-examined the witnesses as to the variety of factors that might have negatively impacted the reliability of their identification of petitioner.

Petitioner has not articulated any facts that would suggest the jury's decision to credit the witnesses' testimony was attributable to any defects in the jury instruction. Further, petitioner fails to articulate how counsel could have drafted a cautionary instruction on eyewitness identification which would have been granted by the trial court. The record indicates the trial court was disinclined to give such an instruction. In Virginia, there is no model jury instruction addressing eyewitness identification, and this Court has not mandated a cautionary instruction on eyewitness identification be given in every case in which a defendant disputes his or her identification by an eyewitness. *Daniels v. Commonwealth*, 275 Va. 460, 465, 657 S.E.2d 84, 86 (2008). Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

(ECF No. 14–13, at 2–3.) The Court discerns no unreasonable application of the law and

no unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) & (2). Given that

17

the resolution of Jennings's claim of ineffective assistance of counsel is highly dependent on Virginia law, Jennings fails to demonstrate any prejudice. *Richardson v. Branker*, 668 F.3d 128, 141 (4th Cir. 2012) ("When a claim of ineffective assistance of counsel raised in a habeas corpus petition involves an issue unique to state law, . . . a federal court should be especially deferential to a state post-conviction court's interpretation of its own state's law."). Moreover, Jennings fails to demonstrate that counsel performed deficiently. Accordingly, it is RECOMMENDED that Claims 3 and 8 be DISMISSED for lack of merit.

### 3.    Claims 4, 5, 13, and 6

In Claim 4, Jennings contends that the Circuit Court abused its discretion when it failed to hold an evidentiary hearing to ascertain whether juror misconduct occurred. (§ 2254 Pet. 16.) Relatedly, in Claim 5, Jennings alleges he was denied due process because of juror misconduct. (*Id.* at 19.) Finally, in Claim 13, Jennings alleges he was denied due process because the jurors failed to follow the Circuit Court's instructions and decided that identification was not an issue. (*Id.* at 41–42.) Jennings raised the issue of juror misconduct on direct appeal. The Court of Appeals of Virginia concluded that Jennings failed to demonstrate any viable basis for relief. (ECF No. 14–6, at 9.) In reaching that conclusions, the Court of Appeals observed:

> Appellant's counsel filed a motion to set aside the verdict, asserting one of the jurors contacted her after the trial and stated she did not believe appellant's identity was proven beyond a reasonable doubt and the jurors did not follow the jury instruction concerning identity. An affidavit signed by the juror stated that during deliberations, the juror expressed her belief that appellant was not the person who committed carjacking because she thought he was not the person depicted in a surveillance video. She stated other jurors were of the same belief, but the jury foreman told them identity was not an issue in the case. The juror indicated she was pressured into changing her

18

verdict to guilty.  Appellant moved the trial court to set aside the verdict due to juror misconduct or, in the alternative, to conduct an evidentiary hearing to determine whether the jury engaged in misconduct.

"Virginia has been more careful than most states to protect the inviolability and secrecy of jury deliberations, adhering to the general rule that the testimony of jurors should not be received to impeach their verdict, especially on the ground of their own misconduct." *Kasi v. Commonwealth*, 256 Va. 407, 425, 508 S.E.2d 57, 67 (1998).  The Supreme Court of Virginia has generally "limited findings of prejudicial juror misconduct to activities of jurors that occur outside the jury room," *Jenkins v. Commonwealth*, 244 Va. 445, 460, 423 S.E.2d 360, 370 (1992), and the Court has held that a trial judge is not required to examine jurors in response to allegations of jury misconduct that is confined to the jury room, *id.*

> [A]fter the discharge of the jury, a juror should not be permitted to say that he unwittingly surrendered his independent view to that of his colleagues, and that hence the verdict to which he has assented is not, in fact, his "honest verdict." *See* 46 C.J., *New Trial*, section 381, p. 360.
>
> Moreover, as Mr. Wigmore says, "it is today universally agreed that, on a motion to set aside a verdict and grant a new trial, the verdict cannot be affected, either favorably or unfavorably, by the circumstances (among others): that one or more of the jurors misunderstood the judge's instruction." *Wigmore on Evidence*, 3d Ed., Vol. 8, section 2349, p. 669.

*Fuller v. Commonwealth*, 190 Va. 19, 29, 55 S.E.2d 430, 436 (1949).

Furthermore, as the trial court noted in its December 4, 2014 opinion letter addressing this issue, there was "no suggestion of outside influence" in the juror's affidavit.  On this record, the trial court did not abuse its discretion in refusing to conduct an evidentiary hearing.

(*Id.* at 8–9.)  The Court of Appeals of Virginia reasonably rejected Jennings's juror misconduct claims in light of "the 'firmly established' *general* rule . . . that juror testimony *may not* be used to impeach a jury verdict. . . .  The only exception to this rule is for external influence . . . ."  *Robinson v. Polk*, 438 F.3d 350, 365 (4th Cir. 2006) (citations omitted).  Accordingly, it is RECOMMENDED that Claims 4, 5, and 13 be DISMISSED.

In Claim 6, Jennings relies upon the juror's affidavit to claim that he is actually innocent. (§ 2254 Pet. 22.) As noted above, Jennings cannot rely upon juror testimony to impeach his verdict of guilty. Moreover, a claim of actual innocence requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Jennings has not presented any evidence of this nature that demonstrates his factual innocence. *Bousley v. United States*, 523 U.S. 614, 623–24 (1998) ("'[a]ctual innocence' means factual innocence, not mere legal insufficiency" (citing *Sawyer v. Whitley,* 505 U.S. 333, 339 (1992))). Accordingly, it is RECOMMENDED that Claim 6 be DISMISSED.

### 4.     Claims 10, 11 and 12

In Claim 10, Jennings faults counsel for failing to object to the prosecutor expressing her personal opinion during closing arguments that Jennings was the person who committed the crimes. This claim lacks merits for the reasons set forth by the Supreme Court of Virginia:

> The Court holds claim [10] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the trial transcript, demonstrates that, during closing argument, in explaining the elements for the charge of wearing a mask in public, the prosecutor stated: "We have to show that the defendant is over sixteen years of age, we all agreed he was forty-three, and that this defendant, this man, Estes Jennings, that he put on a mask in order to conceal his identity." The prosecutor was discussing how the Commonwealth was required to prove: (1) petitioner was over the age of sixteen; (2) and petitioner put on a mask to conceal his identity. The prosecutor was not offering a personal opinion on petitioner's guilt and fairly argued the evidence proved these elements of the offense. Accordingly, counsel could have reasonably determined the prosecutor did not improperly state a personal opinion and

there was no basis to object. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

(ECF No. 14–13, at 5.) The Court discerns no unreasonable application of law and no unreasonable determination of the facts in this rejection of Claim 10. 28 U.S.C. § 2254(d)(1) & (2). Accordingly, it is RECOMMENDED that Claim 10 be DISMISSED.

In Claim 11, Jennings contends that counsel performed deficiently by not objecting when the prosecutor vouched for a prosecution witness during closing argument. (§ 2254 Pet. 36.) Jennings "contends counsel should have objected to the prosecutor's statement that the defense had not discredited the testimony of the eyewitnesses to the crime and that these witnesses had testified truthfully." (ECF No. 14–13, at 6.) As explained by the Supreme Court of Virginia, Jennings cannot demonstrate deficiency or prejudice with respect to Claim 11:

> The record, including the trial transcript, demonstrates that two eyewitnesses identified petitioner as the man they saw commit a carjacking in a convenience store parking lot. Counsel argued during trial these witnesses were mistaken in their identification of petitioner, not that they were untruthful. During closing argument, while discussing a jury instruction on witness credibility, the prosecutor stated the instruction directed the jury to consider the witnesses' interest in the outcome of a case, their bias, and their motives in testifying. The prosecutor then stated the witnesses had no biases against petitioner or a motive to lie about what they had seen and argued, "They came in here and they told you the truth, they told you what happened and they told you that it is [petitioner who] committed those horrible crimes."
>
> Based on the trial record, the witnesses' honesty was not a contested issue. Instead, the only issue was whether the witnesses had correctly identified petitioner as the perpetrator of the crimes. Accordingly, counsel could have reasonably determined the argument was a fair comment on the evidence, *see Elliot v. Warden of the Sussex I State Prison*, 274 Va. 598, 618, 652 S.E.2d 465, 483 (2007), and not a personal opinion by the prosecutor on witness credibility, *Jones v. Commonwealth*, 218 Va. 732, 737, 240 S.E.2d

21

526, 530 (1978) and any objection would have been unsuccessful and unhelpful because the honesty of the witnesses was not at issue. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

(*Id.* at 6–7 (alteration in original).) The Court discerns no unreasonable application of the

law and no unreasonable determination of the facts in this rejection of Claim 11. 28 U.S.C.

§ 2254(d)(1) & (2). Accordingly, it is RECOMMENDED that Claim 11 be DISMISSED.

In Claim 12, Jennings faults counsel for telling the jury that the police knew who

committed this crime during her closing argument. (§ 2254 Pet. 38.) As explained by the

Supreme Court of Virginia, this claim lacks merit:

The record, including the trial transcript, demonstrates that during closing argument counsel was discussing the photographic lineup administered by police to the witnesses of the carjacking. Counsel contended the lineup was unduly suggestive resulting in the misidentification of petitioner by the witnesses. In making this argument, counsel said the officer administering the lineup knew who the suspect of the crime was when presenting the photographs to the witnesses and may have unconsciously influenced the witnesses. Accordingly, counsel did not indicate to the jury the police knew petitioner was the perpetrator. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

(ECF No. 14–13, at 7.) The Court discerns no unreasonable application of law and no

unreasonable determination of the facts in this rejection of Claim 12. 28 U.S.C.

§ 2254(d)(1) & (2). Accordingly, it is RECOMMENDED that Claim 12 be DISMISSED.

### 5.   Claim 15

In Claim 15, Jennings contends that his appellate counsel performed deficiently when she conceded Jennings's guilt in his direct appeal brief.[8] (§ 2254 Pet. 47.) This claim lacks merit. As noted by the Supreme Court of Virginia:

> The record, including petitioner's appellate filings, demonstrates counsel did not concede petitioner was guilty, but accurately stated the trial evidence in the light most favorable to the Commonwealth, the applicable standard for reviewing evidence on appeal of a conviction. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

(ECF No. 14–13, at 8.) The Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the rejection of this claim. 28 U.S.C. § 2254(d)(1) & (2). Accordingly, it is RECOMMENDED that Claim 15 be DISMISSED.

### 6.   Claims 7 and 14

Finally, in an effort to excuse his procedural default, Jennings faults appellate counsel for failing to raise Claims 7 and 14 on direct appeal. As explained below, appellate counsel reasonably eschewed raising either of these claims. In Claim 7, relying on the juror's affidavit discussed above, Jennings contends that the jurors were falling asleep during deliberations. (§ 2254 Pet. 24.) As noted above, Jennings may not rely upon a juror's testimony about jury deliberations to impeach the jury's verdict. *See Robinson*, 438

---

[8] Jennings contends that "counsel's use of the term 'Appellant' in a petition for appeal, while describing an eyewitness's trial testimony about the crime, amounted to a concession [that Jennings] was guilty." (ECF No. 14–13, at 8.)

F.3d at 365 (citations omitted). Thus, appellate counsel acted reasonably in not pursuing Claim 7 on direct appeal.

Claim 14 pertains to information the jury venire might have overheard prior to first coming to the courtroom. The record reveals that while the venire was waiting in a jury room, information from some courtroom in the courthouse was inadvertently piped in over the loudspeaker in the jury room. (Nov. 14, 2014 Tr. 6–7.) While all the potential jurors admitted to hearing something (Nov. 14, 2014 Tr. 8), all of the jurors assured the Circuit Court that they had not heard anything that would prevent them from judging Jennings's case fairly and impartially. (Nov. 14, 2014 Tr. 17–18.) Counsel moved to dismiss the jury, and the Circuit Court denied the motion. (Nov. 14, 2014 Tr. 20–21, 25.) Given the jurors' assurances that they could remain impartial, appellate counsel acted reasonably in refraining to raise Claim 14. Moreover, Jennings cannot demonstrate that he was prejudiced by appellate counsel's failure to pursue Claim 14. Accordingly, it is RECOMMENDED that Claims 7 and 14 be DISMISSED as procedurally defaulted.

### F.    Conclusion

Accordingly, it is RECOMMENDED that the Motion to Dismiss (ECF No. 12) be GRANTED, Jennings's claims and the action be DISMISSED, and the § 2254 Petition be DENIED. It is further RECOMMENDED that a certificate of appealability be DENIED.

Jennings is advised that he may file specific written objections to the Report and Recommendation within fourteen (14) days of the date of entry hereof. Such objections should be numbered and identify with specificity the legal or factual deficiencies of the Magistrate Judge's findings. *See* Fed. R. Civ. P. 72(b). Failure to timely file specific

24

objections to the Report and Recommendation may result in the dismissal of his claims, and it may also preclude further review or appeal from such judgment. *See Carr v. Hutto*, 737 F.2d 433, 434 (4th Cir. 1984).

The Clerk is DIRECTED to send a copy of this Report and Recommendation to Jennings and counsel for Respondent.

It is so ORDERED.

_____ /s/

Roderick C. Young
United States Magistrate Judge

Date: August 29, 2019
Richmond, Virginia